IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS, EASTERN DIVISION

Zambezia Film (Pty) Ltd.,                           )
   A South African Corporation              )
                                )
     *Plaintiff,*                          )
                                )
                      v.       )     Case No. 13-cv-1742
                                )
DOES 1-60                                           ) *JURY TRIAL DEMANDED*,
                                )
     *Defendants*.                         )
                                )

## SUPPLEMENT TO MOTION FOR EXPEDITED DISCOVERY

**I.    INTRODUCTION**

    This Court Ordered in a minute entry on April 3, 2013, which stated in part as follows:

**On Plaintiff's motion for early discovery [3], Plaintiff shall file a supplement to the motion that explains what criteria Plaintiff applied in deciding that the named Does (at least named via their ISP addresses) were part on one swarm. The supplement must include (but not be limited to) an explanation of why the defined swarm ranges in time from November 6, 2012 through December 25, 2012. Here is another area of inquiry: the named Does are limited to ISP addresses located in the Northern District of Illinois, which is an appropriate limitation for personal jurisdiction reasons, but if there were not a geographic limitation applied to the defined swarm, then would the number of defendants be greater than presently named? Any facts that form the premise of the supplement should be supported with an under-oath declaration, such as the one filed with the current motion.**

    This Supplement and the attached exhibits seek to answer the Courts questions and to

explain the legal basis for Plaintiff's decision to group the Defendants as they have been in this

case.  The Plaintiff also notes the recent Memorandum opinion of Judge Shadur in the cases

Zambezia Film v. Does 1-33 (13 cv 1323) and Zambezia Film v. Does 1-60 (13 cv 1741) which

appears to address similar facts to those requested by the Court in this matter.

1

Plaintiff further recognizes the Court's concern with respect to potential litigation abuse, and has made certain additional comments designed to alleviate any concerns that this suit is not filed in good faith and with the intention of proceeding to trial against defendants as necessary. Plaintiff believes that joinder reduces the risk of abuse of the Doe Defendants and promotes judicial economy. As such, Plaintiff urges the Court to maintain joinder in this matter.

## II. ANSWERS TO SPECIFIC QUESTIONS POSED BY THE COURT

### i. The Source of this Information is the Affidavit of Darren Griffin

Exhibit A to this Supplement is a second Affidavit of Darren Griffin. Mr. Griffin and his company Crystal Bay Corporation have provided the expert services used by counsel for Plaintiffs in pursuing this lawsuit. Mr. Griffin operates the software which gathers the information about the John Doe defendants included in Exhibit A to the Complaint in this matter and Exhibit B to the Memorandum in Support of this Motion. Mr. Griffin also operates the software which generated the information about John Does 1-10 which is attached as Group Exhibit B to this Supplement.

Should Plaintiff's claims against one or more of the John Doe defendants proceed to trial, either Mr. Griffin or another representative of Crystal Bay Corporation would likely be called as an expert witness to verify the evidence of infringement of each of the John Doe defendants.

### ii. The Criteria Used to Name the John Doe Defendants

As discussed in Mr. Griffin's affidavit at length, Plaintiff uses monitoring software to identify when a copy of its work, in this case a Motion Picture titled Adventures in Zambezia (the "Motion Picture"), is downloaded on a file sharing site such as Bit Torrent.

Mr. Griffin's first affidavit, attached as Exhibit A to the Memorandum in Support of this

Motion ("First Affidavit"), described in paragraphs 3-19 that the technology exists today to permit individuals to use a series of websites and other internet based software to permit users to download pirated copies of the Motion Picture onto their respective computers. As explained further in the First Affidavit, Mr. Griffin uses a combination of technology and first-hand comparison to determine when users of peer-to-peer networks have uploaded or made available for upload a portion of the Motion Picture. First Affidavit, Par. 20-32. The Software employed by Mr. Griffin, then uses geo-location technology to pinpoint the location of those users, a portion of whom ultimately become John Doe Defendants.

Mr. Griffin's Second Affidavit (Exhibit A, the "Second Affidavit") explains the process of selecting John Doe Defendants to be name in further detail. Mr. Griffin, on advice of counsel concerning the rules of personal jurisdiction, first excludes those defendants for whom geo-location technology does not give an address in the Northern District of Illinois. Second Affidavit, Par. 7-9. He then eliminates those defendants for whom the ISP information will likely not be available due to data retention policies. *Id.* 10-16. He then further eliminates those ISPs with whom litigation to uncover IP addresses would not be practical or expeditious. *Id.* 17-19. He then eliminates those ISPs from whom usable data is likely not available for various technical reasons. *Id.* 20-21. The remaining John Doe Defendants are those which are named. Each such defendant is thus likely to identifiable upon timely inquiry to the associated ISP, and is likely to reside in the Northern District of Illinois.

The Court should also note that, at the request of the Plaintiff given rulings in other jurisdictions, large groups of defendants are divided into multiple filings. In the case of the Motion Picture, Plaintiff has filed a total of 12 lawsuits against defendants from six unique swarms.

3

It should be noted that any John Doe defendants which are not found to reside in the Northern District of Illinois shall be voluntarily dismissed from this action unless another grounds for personal jurisdiction exists. Depending on the economics of litigation in those Defendants' jurisdictions, Plaintiffs may choose to file new actions in the appropriate courts.

### iii.        Criteria in Determining Defendants are Part of One Swarm and the Number of John Doe Defendants in This Swarm

As discussed in the First Affidavit, the John Doe Defendants all use the same "Hash Value" in downloading and uploading copies of the Motion Picture. First Affidavit, Par. 27-31. Using specially designed software, Mr. Griffin verifies that the various "pieces" of the Motion Picture which are traded using a given "Hash Value" will combine to form a copy of the Motion Picture. *Id,* Par. 31. The Hash Value contains a "unique, coded, string of characters called a 'hash checksum.'" *Id*. Par 30. This Hash Checksum confirms that users were trading precisely the same copy of the work. A "swarm" is created as a result of users' computers working together to exchange files with the same Hash Value. *Id*. Par. 29. By using the Hash Value to identify John Doe Defendants, the criteria by definition makes them part of one swarm.

While thousands of users trade files on Bit Torrent daily, the "Hash Value" criteria described above does not yield a particularly large list of potential defendants. Without geographic limitations, the total number of defendants in the swarm would only be 138 users on December 25, 2012 in the entire United States.

The key point of understanding is as follows. A "swarm" is constructed so that all of the users can download a complete version of a given work. In order for this exchange to occur, those very same users offer to upload those portions of the work they already possess once they have downloaded them. While some users (called "leechers" by the Bit Torrent community) do

not allow works on their computers to be copies, even those users do download the files from the swarm. Second Affidavit, Par. 29. Thus, there is a concentrated effort by a group of users to copy and share a specific instance of the work – these are not different versions of the same work, these are identical copies of the same file. The Hash Value thus is precisely the criteria for identifying a given swarm.

### iv. The Range in Time is Reasonable Due to the Time Required to Watch Films and Due to the Indirect Sharing Involved in the Swarm.

Mr. Griffin explains further in his affidavit why it reasonable to include swarm members over a six week span of time. Second Affidavit, Par. 22-39. Mr. Griffin advances several arguments in Paragraph 29 of the Affidavit, and the thrust of them all relies on a basic fact about downloaders of Bit Torrent files: They almost never stop at 1. Mr. Griffin has produced a list of approximately 2650 films and other works downloaded by John Doe #10, as well as smaller lists for each of the John Does 1-9. Second Affidavit, Par. 29(f). The court should note that this list is over 1000 pages in pdf format, but Excel spreadsheets are available upon request and an electronic version of the information would be made available to the Court should this issue proceed to hearing.

Mr. Griffin explains that the average consumer computer has the ability to hold hundreds of movies at one time. Second Affidavit, Par. 25-28. Thus, infringers would not need to delete films as soon as they were downloaded. Rather, it is more likely that the films remained on the defendant's hard drives and were made available for upload during at least a six week span. Mr. Griffin gives several reasons for this in Paragraph 29 of the Second Affidavit, including:

a) The infringer would not be able to watch all of his films at a given time because of the time constraints involved. Rather, it is practical for a downloader to match a film

5

or two a day.  At this pace, John Doe 10 would take 1300 days, or nearly 4 years to watch his entire library of downloaded films.  Par. 29(a).

b)  The infringer may simply choose to wait to watch the film because the modern storage capacities do not require quick deletion.  Par 29(b).

c)  The infringer would likely watch the films more than once as part of a permanent collection.  Par. 29(c).

d)  The infringer may feel a responsibility to be a contributing member of the Bit Torrent community by making his personal library available for download.  Par. 29(d).  And even a downloader who is not so altruistic may elect to keep films available so as not be labeled a "leacher" by the community and see his download speeds reduced as punishment.  Par. 29(e).

All of these reasons would mean users were making films available during an extended period of time.  Because users of Bit Torrent are generally serial infringers, all of the above reasons would contribute to the users thus having their libraries available during the entire six week period.

## III.    THIS COURT SHOULD NOT ADOPT THE "TEMPORALITY STANDARD"

The "temporality standard" contemplated by Judge Shadur in cases filed by Plaintiff with case numbers 13 cv 1743 and 13 cv 41 (Opinion attached as Exhibit B), originating in a flawed note from a law student, improperly divorces the joinder analysis from the "series of transactions" referenced by Rule 20 in that it (a) removes "logically related" fact patterns; (b) ignores alternate transactions pled by Plaintiff; (c) requires direct transactions, contrary to Supreme Court precedent; and (d) fails to address the Supreme Court's preference for joinder.

### i.    The temporality standard is logically inconsistent and unreasonable

"The Case Against Combating BitTorrent Piracy Through Mass John Doe Copyright Infringement Lawsuits," 111 Mich. L. Rev. 283, makes a fatal error in analysis of BitTorrent operation -- an error that was overlooked by both the court Judge Shadur's opinion and in many of the decisions supporting severance.  Alarmingly, this error is one of internal consistency and is apparent from reading the cited quotation itself when the author references "uploading pieces of the file to any other users who enter into the swarm." 111 Mich. L. Rev. 283, 293.  Plaintiff has rephrased the Court's quotation of this section at Doc. 7 at 11, placing this phrase in bold and supplying the logical corrections and conclusions in italics:

> Now, after the exchange, assume all four stay plugged into the swarm through Day 2, **uploading pieces of the file to any other users who enter into the swarm**. On Day 3, B, C, and D disconnect. The next day E, F, and G enter the swarm with A. Since the swarm develops around the file, E, F, and G are part of the same swarm that A, B, and C were in. However, now the file exchange is occurring between A, E, F, and G *and any other users who entered into the swarm on Day 2*. By contrast, B, C, and D have no *contemporaneous* involvement with the second exchange because they left the swarm. Given that B, C, and D were not and could not be *direct* sources for E, F, and G, *but any other users who entered into the swarm on Day 2 would necessarily have obtained piece(s) of the file from B, C, and D and then necessarily provided those pieces in turn to E, F, and G,* the former group's acquisition of the file *can be considered part of the same series of transactions as* the latter's.

In short, even in a hypothetical situation specifically constructed to emphasize the potential for

separation between particular BitTorrent users across time, the author has acknowledged that other users may join the process at any point. These other users immediately become sources for any piece of the file that has been downloaded and as such they serve as secondary sources for the material previously provided by users B, C, and D. It is irrelevant that B, C, and D are not direct sources for E, F, and G because new user X would connect them in a series of transactions. Because a BitTorrent client seeks download from *any* available source and serves as a source to *any* requesting downloader, and because the system is designed to survive the termination of participation by any midpoint user, there is no basis for finding an artificial distinction between direct and indirect transactions, particularly given that these features are known and central to BitTorrent file sharing.

This failure to come to terms with the interrelatedness of swarm transactions across time strikes at the heart of the only rationale the author presents for why a temporality standard should be applied. Realistically, extending the faulty logic of "The Case Against… John Doe Copyright Infringement Lawsuits" would argue that no conspiracy to distribute drugs to minors could exist because only the local dealer was present at the schoolyard at the time of the ultimate sale.

### ii.     The temporality standard ignores Plaintiff's logically related fact pattern

Irrespective of these shortcomings in analysis, the temporality standard also improperly removes from joinder "logically related" fact patterns such as Plaintiff's. For the word "series" to have any meaning in Rule 20(a), the rule must permit joinder when there is something other than the direct transactions involved in the temporality standard. "Series" has been interpreted by Circuit Courts to mean a "logically related" fact pattern:

> [A]ll 'logically related' events entitling a person to institute a legal action

against another generally are regarded as comprising a transaction or

occurrence. The analogous interpretation of the terms as used in Rule 20

would permit all reasonably related claims for relief by or against

different parties to be tried in a single proceeding. Absolute identity of all

events is unnecessary.

*Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974).

That pleadings such as Plaintiff's involve logically related fact patterns, in spite of the

possibility of there being no direct transactions, led one judge to state unequivocally:

it is difficult to see how the sharing and downloading activity alleged in

the Complaint—a series of individuals connecting either directly with

each other or as part of a chain or "swarm" of connectivity designed to

illegally copy and share the exact same copyrighted file—could not

constitute a "series of transactions or occurrences" for purposes of Rule

20(a).

*Digital Sin, Inc. v. Does 1–176*, 2012 WL 263491, at *5 (S.D.N.Y. Jan. 30, 2012).

While the logical relationship test does not require it, should this matter go to trial,

Plaintiff will prove that the Defendants' infringement was committed through the same

transaction or through a series of transactions with mathematical certainty by demonstrating,

*inter alia*, that the algorithm used by BitTorrent Trackers would have caused the entire series of

transactions to be different but for each of the Defendants' infringements.

### iii.    Plaintiff has pled additional transactions sufficient for joinder

Additionally, the temporality standard ignores a series of transactions, pled by Plaintiff,

and not considered by "The Case Against… John Doe Copyright Infringement Lawsuits" or

Judge Shadur's opinion: that each Doe Defendant uploaded at least a piece of the relevant file to

Plaintiff's investigator. Second Affidavit, Par. 33. Inasmuch as no Doe Defendant was

authorized to distribute Plaintiff's copyrighted work and that hypothetical "temporality-

connected" defendants may not have distributed any larger portion of the work, it is entirely

arbitrary to focus on whether the Doe Defendants participated in the swarm simultaneously

rather than on whether the uploads to the investigator were a 'series of transactions' that were

'logically related.'

At least one court, directly and explicitly considering this issue, found that such uploads

to an investigator appropriately support joinder:

> [E]ven if no Doe defendant directly transmitted a piece of the Work to
>
> another Doe defendant, the Court is satisfied at this stage of the litigation
>
> the claims against each Doe defendant appear to arise out of the same
>
> series of transactions or occurrences, namely, the transmission of pieces
>
> of the same copy of the Work to the same investigative server.

*Raw Films v. John Does 1-15*, 2012 WL 1019067, at *4 (E.D. Pa. March 26, 2012).

### iv.     The temporality standard improperly requires direct transactions

An additional problem with the temporality standard is that its apparent requirement for

direct transactions between the Doe Defendants does not comport with the Supreme Court's

logic in *United States v. Mississippi*, 380 U.S. 128 (1965). There, the Court found that the

joinder of six defendants, election registrars of six different counties, was proper because the

allegations were all based on the same state-wide system designed to enforce the voter

registration laws in a way that would deprive African Americans of the right to vote. Although

the complaint did not allege that the registrars directly interacted with each other, or even that

they knew of each other's actions, or that each other's actions directly affected each other in any

way, the Supreme Court interpreted Rule 20 to hold a right to relief severally because the series

of transactions were related and contained a common nexus of law and fact. *United States v.*

*Mississippi*, 380 U.S. 128 at 142-143 (1965).

> [T]he complaint charged that the registrars had acted and were continuing
>
> to act as part of a state-wide system designed to enforce the registration
>
> laws in a way that would inevitably deprive colored people of the right to
>
> vote solely because of their color. On such an allegation the joinder of all
>
> the registrars as defendants in a single suit is authorized by Rule 20(a) of
>
> the Federal Rules of Civil Procedure.

*Id.* at 142. Indeed, the Supreme Court held all of the defendants were joined properly because

they were all acting on the basis of the same system which created a transactional relatedness.

While the Plaintiff surely recognizes that the facts at issue here do not rise to the level of

importance as civil rights litigation, the joinder standard remains the same regardless of the

significance of the case. Thus, similar to the defendants in *United States v. Mississippi*, it is not

necessary for each of the Doe Defendants to have directly interacted with each other Doe

Defendant; or, in the language of the BitTorrent filesharing operation in the case at hand, for

each Doe Defendant to have shared a piece of the file with each and every Doe Defendant when

downloading the copyrighted work. The Doe Defendants are properly joined because the Doe

Defendants all acted under the same exact system. Here, the Doe Defendants acted as part of a

world-wide system designed to disseminate files that would inevitably infringe copyright

owners' distribution rights.

### v. The temporality standard improperly encourages severance

Finally, the temporality standard does not comport with the Supreme Court's preference for joinder:

> Under the (Federal) Rules (of Civil Procedure), the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.

*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 at 724 (1966). While Plaintiff recognizes that the Court's concerns with respect to potential litigation abuse may raise questions of fairness to the parties, as discussed below, Plaintiff believes such concerns are not relevant in this action.

## VI. DEFENDANTS BENEFIT FROM SHARED DEFENSES IN JOINED ACTIONS

Moreover, joinder has been found to be beneficial to Doe Defendants in BitTorrent filesharing cases: [J]oinder in a single case of the putative defendants who allegedly infringed the same copyrighted material promotes judicial efficiency and, in fact, is beneficial to the putative defendants. *See London–Sire Records, Inc. v. Doe 1,* 542 F.Supp.2d 153, 161 (D.Mass.2008) (court consolidated separate Doe lawsuits for copyright infringement since the "cases involve similar, even virtually identical, issues of law and fact: the alleged use of peer-to-peer software to share copyrighted sound recordings and the discovery of defendants' identities through the use of a Rule 45 subpoena to their internet service provider. Consolidating the cases ensures administrative efficiency for the Court, the plaintiffs, and the ISP, and allows the defendants to see the defenses, if any, that other John Does have raised." *Call of the Wild Movie, LLC v. Does 1-1,062,* 770 F. Supp. 2d 332, 344 (D.D.C. 2011) (Emphasis added).

12

## VII.  JOINDER PROMOTES JUDICIAL ECONOMY

Joinder in this case promotes judicial economy.  Nothing but inefficiency for this Court is to be gained by forcing a legitimate movie company to sue in separate suits each Doe Defendant who is infringing its commercially released motion picture through file-sharing the very same illegally seeded file.  Doing so prior to even allowing Plaintiff to obtain their identifying information would result (in this particular case alone) in the processing of 31 separate lawsuits, issuance of 31 separate notices to the U.S. Copyright Office, processing and ruling on 31 separate motions to take discovery in advance of the Rule 26 conference, and issuance of 31 separate subpoenas to the ISPs.  Joinder eliminates the needless intake of suits against individual Doe Defendants who cannot be identified by an ISP, allows the Plaintiff to settle amicably some claims against those that can be identified, and provides Plaintiff with information indicating whether certain Doe Defendants should be maintained in the suit.  Such a result is a key function of Fed. R. Civ. P. 20 in this jurisdiction; the rule is designed "to promote trial convenience and expedite the resolution of lawsuits, thereby eliminating unnecessary lawsuits."  *Alexander v. Fulton Cnty., Ga.*, 207 F.3d 1303, 1323 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003).

## VIII.  CONCLUSION

In summary, Plaintiff believes that the temporality standard contemplated by the Court is flawed and that Plaintiff has pled claims 'arising out of the same… series of transactions.' Plaintiff's particular case does not involve a high risk of abuse, and joinder further reduces any risk to the Doe Defendants.  Given that joinder will promote judicial economy and given that Plaintiff addressed all of the Court's specific inquires, Plaintiff urges the Court to maintain joinder in this matter.

Respectfully submitted,

/s/ Matthew Lee Stone /s/
One of Attorneys for Plaintiff

Matthew Lee Stone
**SCHNEIDER & STONE**
8424 Skokie Blvd
Suite 200
Skokie, Illinois 60077
ARDC # 6297720
Office: (847) 933 – 9531
Fax: (847) 676-2676